

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| COMMUNITY CARE - BOSSIER, INC. | CIVIL ACTION NO. 06-0181 |
| VERSUS | JUDGE DONALD E. WALTER |
| CHARLES E. FOTI, JR., IN HIS CAPACITY AS ATTORNEY GENERAL OF THE STATE OF LOUISIANA, ET AL. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before this Court is a Motion for Temporary Restraining Order [Doc. #1] filed on behalf of plaintiff, Community Care - Bossier, Inc. ("Community Care"). Defendants oppose this motion. For the reasons assigned herein, plaintiff's motion is **DENIED**.

As to plaintiff's claims against Charles E. Foti, Jr. and Andrew Lejeune, this Court abstains under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny. Accordingly those claims are **DISMISSED**. As to the remaining claims, there is no showing of irreparable harm under Canal Author. v. Callaway, 489 F.2d 567, 572-73 (5th Cir. 1974)(en banc). The motion for injunction and trial on the remaining claims will be set in due course. Counsel are encouraged to set up a Scheduling Conference with Magistrate Judge Hornsby.

## STATEMENT OF THE CASE

Plaintiff, Community Care - Bossier, Inc. ("Community Care"), brings this action against Charles E. Foti, Jr. ("Foti"), in his capacity as Attorney General of the State of Louisiana, Andrew J. Lejeune, Jr. ("Lejeune"), Frederick Cerise, M.D. ("Cerise"), individually and in his capacity as Secretary of the Louisiana Department of Health and Hospitals, Jean Melanson ("Melanson") and Ann Olivier ("Olivier"), asking this Court to, inter alia, issue a TRO enjoining and restraining

defendants, and any persons acting directly or indirectly on their behalf, from enforcing certain state court Orders related to specifically named bank accounts of Community Care. See Complaint for Damages and Injunctive Relief, pp. 10-11. Plaintiff also asks this Court to issue a TRO enjoining and restraining Cerise, in his capacity as Secretary of the Louisiana Department of Health and Hospitals, and any persons acting directly or indirectly on his behalf, from enforcing the provisions of a Memorandum dated January 24, 2006, sent by Melanson and Olivier "or any order purporting to suspend or revoke any license held by Community Care - Bossier, Inc., or the enrollment of Community Care - Bossier, Inc., in the Louisiana Medicaid Program." Id. at p. 11.

Community Care is a direct service provider of waiver services under the Louisiana Medical Assistance Program ("Medicaid"). Community Care is duly license by the Louisiana Department of Health and Hospitals (the "DHH") to provide outpatient home health services to its clients. Community Care enrolled in the Louisiana Medicaid program on June 15, 2000. The DHH records indicate that as of August 20, 2004, the owners of Community Care were Cindy Wheeler, Danny Williamson, Cindy Fryer, Ron Morgan and Carol Morgan.

On or about March 23, 2005, Agent Lejeune, an agent of the office of the Attorney General, Louisiana Department of Justice, Criminal Division, Medicaid Fraud Control Unit, opened an investigation into the billing practices of Community Care based on information from the DHH regarding potentially fraudulent claims submitted to and subsequently paid by the Medicaid program. As a result of the investigation, Lejeune prepared applications for warrants for the arrest of Carol Morgan ("Morgan"), Janette McKenney ("McKenney"), Cheryl Foster ("Foster") and Ernest Goldston ("Goldston"). The arrest warrants charged Morgan, McKenney, Foster and Goldston with two counts each of Medicaid fraud under La. R.S. 14:70.1, and two counts of criminal conspiracy

under La. R.S. 14:26. Morgan, McKenney and Foster are employees of Community Care while Goldston is a former employee, having last performed work for Community Care on December 30, 2005. As is the standard procedure in Medicaid fraud prosecutions, the arrest warrant applications were presented to and signed by a judge in the 19th Judicial District Court for the Parish of East Baton Rouge, on November 23, 2005. At approximately the same time, Lejeune prepared affidavits in support of requests for search warrants to search Community Care, Hibernia National Bank ("Hibernia") and Citizens National Bank ("CNB").

As the physical location of the items sought to be searched was in Bossier Parish, the affidavits and their corresponding search warrant applications were presented to and signed by the Honorable John Robinson, Judge of the 26th Judicial District Court for the Parish of Bossier, on January 23, 2006. On that same date, Judge Robinson also issued the State's requested TRO which orders that McKenney, Goldston, Morgan, Foster "and/or their spouses, family members, officers, agents, counsel" be restrained from "accessing and/or using in any manner" certain accounts at Hibernia. The TRO further restrains McKenney, Goldston, Morgan, Foster, "and/or their spouses, family members, officers, agents, counsel" from "selling, disposing of and/or hiding any assets, including but not limited to, residences and their contents, any devices used for transporting persons and/or things, and any interest in movable and/or immovable property."

On January 24, 2006, State agents and the Bossier Parish Sheriff's Department arrested Morgan, McKenney, Foster and Goldston. Each arrestee was personally served with a copy of the Order for Search of Community Care, Hibernia and CNB, and a copy of the Order granting the TRO. The search warrants issued for Hibernia and CNB authorized the search of accounts in the name of Community Care - Bossier, Inc. or Community Care of Bossier, Inc., as well as accounts in the

names of the arrestees. The search warrants indicate that they have been issued to seize the assets held in certain account numbers and accounts held under the names of the arrestees and Community Care - Bossier, Inc. or Community Care of Bossier, Inc.

On January 24, 2006, the DHH was notified that several employees and/or owners of Community Care had been arrested, that bank accounts in the names of Community Care and the arrested employees/owners had been "frozen," and that medical records in the possession of Community Care had been seized by agents of the Louisiana Department of Justice. Defendants assert that the DHH feared the actions of the Louisiana Department of Justice had rendered Community Care incapable of caring for its waiver service recipients, so the DHH instructed defendants Melanson and Olivier[1] to assure that the care of those recipients was not interrupted. According to defendants, Melanson and Olivier drafted and transmitted a letter to the DHH Support Coordination Agencies in the Bossier region to accomplish that purpose. The letter instructed those agencies, which act as case managers for Community Care's clients, to immediately offer the affected waiver service recipients "freedom of choice" to change direct service providers as Community Care was no longer eligible to provide Medicaid waiver services. According to Community Care, neither Melanson nor Olivier sent Community Care a copy of the January 24 letter; administrative proceedings were not initiated against Community Care prior to sending the January 24 letter.

On January 25, 2006, the Louisiana Department of Justice obtained an Order issued by Judge Robinson allowing the transfer of $44,000.00 from Community Care's main account into the payroll

---

[1] Melanson is employed by the DHH office for Citizens with Developmental Disabilities, Waiver Supports and Services. Olivier is employed by the DHH Bureau of Health Services Financing, Long Term Supports and Services.

account to be used for the "sole purpose" of paying Community Care employees to "prevent a break in services for Community Care patients/clients." The DHH informed the Louisiana Department of Justice that Community Care's clients/patients would be reassigned to new caregivers by Friday, January 27, 2006.

On January 27, 2006, in response to the reported arrests of Community Care personnel, Cerise terminated Community Care's provider agreements pursuant to La. R.S. 46:437.11(D)(2) which provides that "the secretary [of the DHH] may terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding." See also La. R.S. 46:437.3(27). The DHH notified Community Care of the termination of its provider agreements effective January 24, 2006 in letters dated February 1, 2006.

On February 1, 2006, Community Care filed this action seeking, inter alia, a temporary restraining order. Plaintiff asserts that the withholding of Medicaid payments combined with the closing of the Medicaid provider numbers has essentially put Community Care out of business - "Community Care cannot provide services to Medicaid clients, will not receive payment for services provided to Medicaid clients, and, pursuant to the search warrant, any funds that it does receive, up to $990,000.00, are frozen." Brief of Community Care in Support of Injunctive Relief, p. 8.

## LAW AND ANALYSIS

### I. *Younger* Abstention.

The Younger doctrine prohibits the enjoining of a state criminal prosecution absent certain exceptional circumstances. In Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), the Supreme Court found that the basic concerns regarding comity and federalism voiced in

Younger were also fully applicable to civil proceedings in which important state interests are involved. In Trainor v. Hernandez, 431 U.S. 434, 440, 97 S.Ct. 1911, 1916, 52 L.Ed.2d 486 (1977), the Court found abstention indicated where the state initiated a civil proceeding for the recovery of monies fraudulently obtained from the state by a welfare recipient. The Court discussed the importance that the state as sovereign attached to the prosecution of the suit, stressing that the state could have initiated criminal proceedings to vindicate its interests and concluding that "the principles of Younger and Huffman are broad enough to apply to interference by a federal court with an ongoing civil enforcement action such as this, brought by the State in its sovereign capacity." 431 U.S. at 444, 97 S.Ct. at 1918.

As was the case in Huffman, supra, the State here is a party to the state court proceedings involving the TRO. Further, the State obtained the search warrants at issue. The TRO was obtained in anticipation of criminal prosecutions being commenced against employees, and a former employee, of Community Care, for alleged Medicaid fraud. Huffman, 420 U.S. at 604, 95 S.Ct. at 1208. The applications for search warrants were based on the DHH's suspicions of violations of the Medicaid statutes. See Complaint, Exhs. A & B; see also La. R.S. 46:437.6 & 437.7; Opp. by Foti, et al, p. 10. The assets in the Hibernia and CNB bank accounts of Community Care were "frozen" pursuant to La. R.S. 46:437.7,[2] part of the statutory scheme governing the Louisiana Medicaid Program. As noted by the Supreme Court in Moore v. Sims, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979), the existence of these conditions, or the presence of such other vital concerns

---

[2] Foti and Lejeune assert that the search warrant orders mistakenly cite La. R.S. 46:437.7 when La. R.S. 46:437.6 was the appropriate statute under which assets of a health care provider may be frozen prior to a hearing.

6

"as enforcement of contempt proceedings, Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), or the vindication of 'important state policies such as safeguarding the fiscal integrity of [public assistance] programs,' Trainor[, 431 U.S. at 444, 97 S.Ct. at 1918], determines the applicability of Younger-Huffman principles as a bar to the institution of a later federal action."

The only pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims asserted by Community Care. See Moore, 442 U.S. at 430, 99 S.Ct. at 2381. Louisiana law appears to raise no barriers. Id. Community Care was free to bring the same or similar suit in state court as that presently before this Court in response to the issuance of the search warrants.[3] It chose not to. As stated by the Juidice Court:

> Here it is abundantly clear that appellees had an *opportunity* to present their federal claims in the state proceedings. No more is required to invoke Younger abstention. . . . Appellees need be accorded only an opportunity to fairly pursue their constitutional claims in the ongoing state proceedings . . . and their failure to avail themselves of such opportunities does not mean that the state procedures were inadequate. (Footnotes omitted; emphasis in original).

This Court finds that the claims against Foti and Lejeune regarding the issuance of the search warrants and the TRO require the exercise of Federal judicial restraint in that any intervention into the State Court proceedings is foreclosed under Younger, supra. This Court further finds that none of the exceptions enunciated by the Court in Younger are applicable to the case sub judice as there is no evidence before this Court to indicate that defendants sought and obtained search warrants and

---

[3] As noted by Community Care, the TRO restrained only those individuals listed in the Order and/or their spouses, family members, officers, agents, employees or counsel. See Complaint, Exh. F. Thus, the TRO did not directly affect Community Care.

the TRO in bad faith or to harass Community Care.[4] Accordingly, plaintiff's claims against Foti and Lejeune are DISMISSED.

## II. Standard for TRO.

There are four prerequisites for the extraordinary relief of a TRO or preliminary injunction. To prevail, a plaintiff must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of immediate and irreparable harm, for which he has no adequate remedy at law; (3) that greater injury will result from denying the TRO than from its being granted; and (4) that a TRO will not disserve the public interest. Canal Author. v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974) (en banc). If a party fails to meet any of the four requirements, the court cannot grant the TRO or preliminary injunction. See Allied Marketing Group, Inc. v. CDL Marketing, Inc., 878 F.2d 806, 809 (5th Cir. 1989); Canal Author., 489 F.2d at 576.

An injury is "irreparable" only if it cannot be undone through monetary remedies. Deerfield Medical Center v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981). Community Care asserts that it will suffer, and has already suffered, immediate and irreparable injury and loss as a result of its license and enrollment in the Louisiana Medicaid Program being suspended:

> Community Care will lose all of its employees who provide services to its clients and will lose the clients themselves, because such clients will be forced to use the services of other health care providers. . . . [defendants] have sought to drive Community Care out of business before it is named as a defendant or has had any opportunity to defend itself in court or in any administrative proceeding.

Community Care Brief in Support of Injunctive Relief, p. 9. Community Care further asserts that

---

[4] A court need not stay its hand under Younger and its progeny if the court finds that the state proceeding is motivated by a desire to harass or is conducted in bad faith. Huffman, 420 U.S. at 611, 95 S.Ct. at 1212.

8

its funds are being withheld "based upon the violation of Community Care's constitutional rights through the continued seizure of its bank accounts. Community Care has a property right in funds that are for payment of services that have already been performed." Id. at p. 15.

To the extent plaintiff's claims relate to the withholding of funds based on the search warrants issued, this Court declines to exercise jurisdiction over those claims pursuant to Younger as discussed above. On the other hand, to the extent plaintiff's claims relate to the allegedly unconstitutional suspension of its Medicaid license and enrollment, this Court finds such claims to be susceptible to a monetary remedy.

Federal courts recognize that the violation of certain constitutional rights might constitute irreparable injury sufficient to justify issuance of a TRO. See Deerfield Medical Center, 661 F.2d at 338 (violations of First Amendment freedoms and privacy rights constitute irreparable injury); Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). However, as asserted by the DHH defendants, a plaintiff must first demonstrate the existence of such a constitutional right before it can claim that the denial of that right constitutes irreparable injury.

At the least, Community Care seems to assert that the actions taken by the DHH defendants in issuing the freedom of choice letters and in suspending Community Care's license and enrollment in the Louisiana Medicaid Program violated Community Care's constitutional right to due process. The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. Board of Regents of State

Colleges v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Id. at 577. Property interests are not created by the Constitution but are created and defined "by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id.

In Senape v. Constantino, 936 F.2d 687, 690 (2d Cir. 1991), the Second Circuit discussed that whether state law created an entitlement to the governmental benefit at issue rested largely in the language allowing for the rejection of such benefit. In particular, the Senape Court relied upon its analysis in Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577 (2d Cir. 1989), to find that the discretion provided state officials in determining whether to terminate one's status as a qualified provider suggests that recipients of such status have no entitlement to those benefits.

> Where the state provisions bestow a right that cannot be properly eliminated except for cause, that right constitutes property protected by procedural due process. On the other hand, the existence of provisions that retain for the state significant discretionary authority over the bestowal or continuation of a government benefit suggests that the recipients of such benefits have no entitlement to them.

Plaza Health, 878 F.2d at 581 (citations omitted); Senape, 936 F.2d at 690.

This Court finds the Second Circuit's reasoning persuasive. In the case sub judice, the DHH retains discretionary authority to terminate a health care provider's enrollment in the Louisiana Medicaid Program much like the New York Medicaid providers in Senape, supra, and Plaza Health,

10

supra. See La. R.S. 46:437.11(D).[5] The structure of Louisiana's Medicaid Program suggests that Community Care does not have a property interest in continued participation in the program. There is doubt that an interest protected by due process exists. Without a constitutionally protected interest, plaintiff cannot demonstrate irreparable injury.

Plaintiff has failed to convince this Court that the damages alleged are anything more than business or economic losses that clearly can be compensated with monetary damages. As this Court finds that plaintiff is not able to establish the element of irreparable harm, plaintiff's motion for a TRO must be **DENIED**.

## CONCLUSION

For the reasons stated above, plaintiff's claims against Foti and Lejeune are **DISMISSED** as this Court declines to exercise jurisdiction over those claims pursuant to Younger and its progeny.

---

[5]La. R.S. 46:437.11(D) provides that:

(1) Unless the provider agreement is terminated by the secretary for cause as provided in Paragraph (2) of this Subsection, a health care provider agreement shall be effective for a stipulated period of time, shall be terminable by either party thirty days after receipt of written notice, and shall be renewable by mutual agreement.

(2) The secretary may terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding.

11

Further, plaintiff's motion for a TRO against the DHH defendants is **DENIED** as plaintiff cannot meet its burden of proof.

**THUS DONE AND SIGNED,** in Shreveport, Louisiana, this 13 day of February, 2006.

/s/ Donald E. Walter

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE